Louis M. Parker FORD, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Supreme Court of Kentucky.

Dec. 22, 1983.

Rehearing Denied March 29, 1984.

**306**

Jack Emory Farley, Public Advocate, Kevin McNally, M. Gail Robinson, Asst. Public Advocates, Frankfort, for appellant.

Steven L. Beshear, Atty. Gen., Mary D. Schoening, Asst. Atty. Gen., Frankfort, for appellee.

GANT, Justice.

Appellant was convicted of capital murder in the death of Susanne Schick, which murder occurred as a result of beating and stabbing on September 11, 1980. At the time of the murder, appellant was an inmate at LaGrange Reformatory but was housed in a dormitory in Frankfort and working as a trusty about the grounds of the capital and the governor's mansion. The murder occurred in the immediate vicinity of the dormitory and the victim's home near there. The appellant was sentenced to life imprisonment.

The other facts of this case will be discussed as necessary if they pertain to issues presented for argument by the appellant.

## GRAND JURY SELECTION

Appellant was indicted in Franklin County, the county of the offense, and he raises several issues concerning the composition of the grand jury, contending that the pool from which the grand jury was selected in that county did not represent a fair cross section of the community. He complains that women, young adults and college students were underrepresented on the panel. It should be first noted that the grounds for challenge of the composition of a grand jury panel lie in the equal protection clause of the Fourteenth Amendment and not in the due process requisites of the Fifth and Sixth Amendments. *See Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979); *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). Inasmuch as the appellant is a male penitentiary inmate, over 50 years of age, his complaint that women, young adults and college students were underrepresented on the panel does not merit our consideration.

However, as appellant is a black, we must examine appellant's complaint of underrepresentation by nonwhites. There is absolutely no showing herein, by any direct evidence whatsoever, of any racial discrimination in the method of selection of grand jurors. However, the federal decisions have enshrined the statistician on the throne of expertise, and it is on statistical data alone that the appellant relies. *See Castaneda v. Partida, supra.* In so relying, the appellant carries the burden to establish a prima facie case under the guidelines set out in the federal cases, and an excellent dissertation on that burden is contained in *Moultrie v. Martin,* 690 F.2d 1078, 1081 (4th Cir.1982):

> In order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. *Hernandez v. Texas,* 347 U.S. 475, 478–479, 74 S.Ct. 667, 670, 671, 98 L.Ed. 866 (1954). Next the degree of underrepresentation must

be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. (Case citations omitted). This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination in jury selection against a delineated class. (Citation omitted). Finally, as noted above, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. (Citations again omitted). Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut the case.

■ As heretofore stated, the appellant has taken the first step because he is black, and thus a member of a "recognizable, distinct class, singled out for different treatment under the laws." However, striding up the next two steps is fraught with opportunity to trip when employing raw statistical data. In the case before us, the appellant has exhibited two distinct stumbling blocks. First, his statistical data was based on random sampling of jury panels for a period of two years, which period we do not feel constitutes a period of significance such as would satisfy the directives of *Moultrie* and *Castaneda, supra.* Additionally, the basis for comparison between the number of blacks contained in the random samples was the U.S. census for 1970, which furnished data on the total population of the county, without regard for jury eligibility. This comparison was specifically condemned in *Moultrie v. Martin, supra,* in which the court stated:

First, the petitioner utilized the percentage of blacks in Colleton County (47%) as the statistic for comparison with the percentage of blacks actually on the grand juries. The use of this statistic for this purpose is inappropriate because the grand jury membership was based on the county voting rolls.

■ KRS 29A.040, as then in effect, directed that the master list from which names of prospective jurors shall be selected shall consist of the voter registration lists and the property tax rolls for the county. We have been furnished with no statistics reflecting black voters or black property owners, so there is no basis upon which we can apply any formula reflecting a standard deviation analysis and hypothesis testing. *See Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), and *Moultrie v. Martin, supra.*

■ Even should we accept the period of two years as significant or accept the census report as a statistical basis for comparison, the appellant has failed to make a prima facie case. As the *Moultrie* court stated:

When a litigant seeks to prove his point exclusively through the use of statistics, he is borrowing the principles of another discipline, mathematics, and applying these principles to the law. In borrowing from another discipline, a litigant cannot be selective in which principles are applied. He must employ a standard mathematical analysis. Any other requirement defies logic to the point of being unjust.

In the instant case, the appellant utilized a statistical expert, who employed the standard mathematical analyses and who testified that *none* of the analyses for race "reached significance."

■ In passing, appellant contends that KRS 29A.040 is unconstitutional on the ground that many otherwise eligible jurors are excluded because they do not register to vote nor do they own property. No authority is cited other than a report on a project of the League of Women Voters, referred to in 2 Black L.J., 164, 165 (1972). It is our opinion that KRS 29A.040 is constitutional, representing an effective manner by which to insure representative jury panels from segments of the community. Cf. *Sims v. Georgia,* 389 U.S. 404, 88 S.Ct.

523, 19 L.Ed.2d 634 (1967), and *Jones v. Georgia*, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967).

■ Appellant's attempt to place the stamp of discrimination by reference to the color (white) of the jury commissioners, who are selected by circuit judges, and of grand jury foremen, who are elected by the other members of their group, does not contain either substance or merit.

## PETIT JURY SELECTION

■ This case was tried in Scott County, upon change of venue, and appellant continues his attack upon jury selection, this time in reference to the petit jury. He again complains of underrepresentation of women, young adults and college students. It is in the selection of petit jury panels that the due process provisions of the federal and state constitutions appear, and it is required that petit jurors be drawn from a fair cross section of the community. *See Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). However, the application of those due process provisions is defined in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), in which the court stated:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the numbers of such persons in the community; and (3) that the underrepresentation is due to the systematic exclusion of the group in the jury-selection process.

■ In applying this prescribed test, we first hold that young adults and college students, whether we consider them as one group or two, are not distinctive or cognizable as a class. The terminal ages of "young adults" defy definition, and we know of no end to the maze that could be created by classifying jurors as young adults, middle-aged adults, elderly adults,

and on and on. We find no recognition of such class in the law or special legislation applying thereto; we find no special characteristics, interests or cohesive traits that merit such a position as that advocated by the appellant. We cast our lot with the majority of federal and state authority. *See Brown v. Harris*, 666 F.2d 782, 783 (2d Cir.1981), and *United States v. Kleifgen*, 557 F.2d 1293, 1296 (9th Cir.1977).

■ Women, of course, do constitute a distinctive group under the law, but again we are furnished with no direct proof which would create a prima facie case of underrepresentation. Again, appellant relies totally on statistical data and again he utilizes random sampling of the jury pool over a two-year period, comparing that sample with the 1970 census of the county, which he mistakenly categorizes as the "eligible population." As we have previously indicated, KRS 29A.040, has fixed the eligible population for jury service as registered voters and property owners. We simply have no ratio afforded us between the random sampling and the actual number of women eligible to serve under the statutory requirements. Without a proper standard for comparison, we cannot find significant underrepresentation in the instant case. Also, again, the two-year sampling does not qualify as a significant period of time as required by *Castaneda.*

Thus, it is our opinion that, under the method utilized by the appellant, he has failed to raise a presumption which would create a prima facie case of discrimination by his use of raw statistical data. He has presented us with no law which has singled out a recognizable distinct class for different treatment, either as written or applied; he has failed to prove underrepresentation at all, much less for a significant period of time; and has demonstrated no selection procedure which is susceptible to abuse or is not racially neutral, all of which factors are required by *Castaneda v. Partida, supra.*

Appellant next contends that he was improperly denied funds for the employment

of an additional expert statistician. He presents us with no showing that the results reached by an additional expert would have differed, in any respect, with the results reached by the expert he did retain, and this is without merit.

■ Additionally, the statute (KRS 31.-110) providing for assistance to needy persons charged with a crime states that such persons are entitled to be provided with "necessary services ... including investigation and other preparation." We do not conceive that employment of statisticians and mathematicians to examine the representation of recognizable groups on jury venires, especially in the absence of specific knowledge of irregularities, to be included in "necessary services." We know of no statute or principle which would authorize expenditures of public funds to conduct a witch hunt. Cf. *Gilliam v. Commonwealth*, Ky., 652 S.W.2d 856, 858 (1983).

### TRIAL

■ Appellant next assigns several trial errors as grounds for reversal. He first argues that there was insufficient evidence to sustain his conviction. We disagree. Worded simply, the standard to which circumstantial evidence must conform is that it be of such nature that based upon the whole case it would not be clearly unreasonable for the jury to find the defendant guilty beyond a reasonable doubt. Cf. *Nugent v. Commonwealth*, Ky., 639 S.W.2d 761 (1982), and *Trowel v. Commonwealth*, Ky., 550 S.W.2d 530 (1977). We have scrutinized the voluminous evidence herein and find it sufficient under that standard.

Certain scientific evidence on behalf of the Commonwealth was presented, primarily by two witnesses. Bedclothing, shoes, socks, pajamas and a T-shirt were found in appellant's room, which articles contained bloodstains. Possible presence of blood was found on appellant's hands, and a knife was discovered in the laundry room where the appellant worked. At the crime scene, a hole was discovered in the wall which had apparently been punched into it during the murder, in which hole skin tissue was discovered. Appellant was discovered to have lacerations on his left hand, with missing skin tissue, and abrasions and contusions on his left upper arm. Appellant's explanation of the cuts and missing skin was that he had been scratched by a cat.

David Alford, the state serologist, testified that he had examined the hole made in the wall and had discovered skin tissue there in two locations, upon which tissue he had done some enzyme testing and had measured the tissue. He then testified that he had examined the hands of the appellant, noting a missing piece of skin upon the middle finger of the left hand and a scraping on another part of the hand. He was then permitted to give his opinion, over objection, that there was little chance that the skin pieces found at the scene could have come from anyone but the appellant. To illustrate his testimony, Alford used a cast of the appellant's hand and an enlarged photograph of the hole in the wall.

In relation to this evidence, appellant asserts three errors, to-wit: (1) Alford was not qualified as an expert to express his opinion; (2) there was prejudicial surprise, and (3) no foundation was laid for the use of the exhibits.

■ On the question of experts, it has long been the law of this jurisdiction that the decision as to the qualifications of an expert rests in the discretion of the trial court. *Kentucky Power Company v. Kilbourn*, Ky., 307 S.W.2d 9, 12 (1957). Alford is a forensic serologist, who identifies and tests biological materials, working with microscopic comparisons for size, quantity and quality. Appellant frankly admits that he knows of no one who engages in the profession of matching skin tissue against holes. Additionally, a well qualified surgeon, testifying for the appellant, virtually destroyed the testimony of the state serologist and testified that matching was impossible, as the skin tissue, once removed, would shrink and the wound would

enlarge. However, it is our opinion that Alford presented sufficient qualifications to the court that there was no abuse in the discretion of the trial judge in permitting him to testify and give his opinion as an expert.

■ The contention regarding surprise is without merit. Appellant had conducted a lengthy pre-trial deposition of Alford and did not ask Alford about any comparative measurements nor is there any evidence that Alford deliberately withheld anything. A general order requiring the Commonwealth to furnish the results of scientific tests or experiments does not avail the appellant to relief under RCr 7.24(9), where an actual deposition was taken. This is not a "surprise" witness but one who testified at his deposition that he had, in fact, discovered the skin tissue and measured it. He was never asked if he had compared those measurements with the appellant's wounds. Further, we see no manner in which the alleged surprise was injurious to this appellant.

In regard to the exhibits utilized by Alford, there was no objection made to the use of the enlarged photograph and a qualified witness (the state pathologist) thoroughly authenticated the cast of the hand. There is, additionally, no contention that either exhibit was inaccurate.

■ Appellant next contends that he was denied due process by alleged wasteful and negligent testing processes used by the lab technicians who sought to compare the victim's blood with that found on the appellant's T-shirt. If, for the sake of argument, we agree with the appellant that the conduct was both wasteful and negligent, it did not rise to the point of denial of due process under the circumstances of this case. First, it is admitted that the testing methods utilized by the state laboratory were proper. They did fail to make a simple test which possibly could have disclosed whether the blood came from a black, such as the appellant, or a white, such as the victim. Both the appellant and the victim had the same type blood—Type O—with similar enzymes, but that similarity was common to 60 million people. In short, the blood tests were so inconclusive as to constitute little of value. Appellant seeks to rely upon *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which case is not in point and merely holds that suppression of exculpatory evidence is fatal. Here there is no showing that any such evidence was suppressed.

The remaining assignments of error are without merit, and we will not comment thereon.

The judgment is affirmed.

All concur except LEIBSON, J., who dissents and files herewith a dissenting opinion.

LEIBSON, Justice, dissenting.

Respectfully, I dissent. Ford was substantially prejudiced by the state serologist's testimony in this case. Speaking as an "expert," the serologist stated his opinion that skin specimens found at the crime scene matched abrasions on Ford's hand and likely came from Ford. It was reversible error to permit such testimony regarding an ultimate conclusion only the jury could reach.

In *O'Connor & Raque Co. v. Bill,* Ky., 474 S.W.2d 344, 347 (1971), we note that "an expert may be of great assistance to the jury in providing information without expressing an opinion on the ultimate factual issue involved in the litigation." We held inadmissible the testimony of an architect that the condition of a doorway was unsafe, because to permit such testimony "would be to allow the witness to take the place of the jury." *Id.* That principle was violated in the present situation.

The present case is analogous to cases where police officers have been limited in their testimony to describing skid marks and debris because they were not qualified to express a conclusion as to the point of impact of two vehicles. Cf. *Alexander v. Swearer,* Ky., 642 S.W.2d 896 (1982) and *Southwood v. Harrison,* Ky.App., 638 S.W.2d 706 (1982). Expert testimony is

properly limited by the extent of the expertise.

So, likewise, in this case the serologist could testify to the underlying facts that skin specimens were removed from a hole in the plasterboard wall and as to his measurements of these specimens against the abrasions observed on Ford's hand. But he should not have been allowed to state his conclusion that the skin likely came from Ford. His conclusions were poorly conceived, beyond his limited expertise, and directed at ultimate facts that were for the jury to decide. Nevertheless, they had the potential for being very damaging evidence in the eyes of the jury. I would reverse.