Harold McQUEEN, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Supreme Court of Kentucky.

Feb. 16, 1984.

Rehearing Denied June 14, 1984.

Jack Emory Farley, Public Advocate, Linda K. West, Mark Posnansky, Asst. Public Advocates, Frankfort, for appellant.

Steven L. Beshear, Atty. Gen., Frankfort, Penny R. Warren, Virgil W. Webb, III, Asst. Attys. Gen., for appellee.

GANT, Justice.

Appellant was convicted of first degree robbery and murder in the course thereof,

and sentenced to 20 years and death, respectively. The crimes occurred on January 17, 1980, during an armed robbery of a Minit Mart, the store clerk being shot in the head from a distance of three to six inches and then through the back of the neck. The evidence of guilt was so overwhelming it will not be discussed herein, except as it relates to assignment of error by appellant.

■ The first group of errors asserted by appellant relates to the jury, its selection and assorted problems. The first allegation relates to the discharge of one juror after she had been seated on the panel, fourteen jurors having been originally qualified. Briefly, the court received unsolicited evidence that the juror had briefly discussed the case, specifically discussing her ability to assess the death penalty, with fellow schoolteachers on one occasion and with members of her family on another. An inquiry was conducted in chambers, during which the juror unequivocally denied expressing any opinion. It should be pointed out that it is uncontradicted that any alleged conversations were instigated by others, not by the juror, and that her greatest impropriety, if any, was in not reporting those persons to the court. However, RCr 9.70 requires that jurors be admonished, as they were herein, that they shall not permit anyone "to speak to, or communicate with, them on any subject connected with the trial ...." The trial court must be vested with discretion in this matter and, in this instance, he exercised that discretion and dismissed the juror on the appearance of impropriety and on her violation of the admonition not to permit persons to discuss the case with her. It was not based on her alleged statement of doubt about her feelings in regard to the death penalty, and we find no abuse of the discretion of the lower court, and hence no error.

■ The next error alleged is that young adults were materially underrepresented on the jury panel, denying appellant a "fair cross section of the community" as mandated by *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). We have disposed of this argument in *Ford v. Commonwealth*, Ky., 665 S.W.2d 304 (1983), and note in passing that both this case and *Ford* involved communities in which colleges and universities are located, which has a tendency to distort the "young adults" picture. Having held that Kentucky does not recognize young adults as an identifiable group, exclusion of which would be prohibited, we find no error. We would also note at this point that we have upheld the constitutionality of KRS 29A.040 in *Ford, supra*, which point was also raised by appellant.

■ Appellant next asserts that the jury commissioners granted automatic exemptions to various groups, including doctors, lawyers, policemen, unemployed, elderly who were ill, troublemakers, etc., basing this allegation solely on the transcript of another case which was tried some four years prior to this case. No evidence whatever is presented to indicate that this practice still exists, if it ever did, and we are furnished with no evidence from which we may make a determination.

■ Appellant next contends that it was error to deny him funds to secure the service of experts for two purposes. The first was to conduct a search to determine proper representation of a cross section of the community on the jury panel. There was not one shred of evidence herein which indicated any irregularity or underrepresentation. We disposed of this argument in *Ford, supra*, when we said:

We do not conceive that employment of statisticians and mathematicians to examine the representation of recognizable groups on jury venires, especially in the absence of specific knowledge of irregularities, to be included in necessary services. We know of no statute or principle which would authorize expenditures of public funds to conduct such a witch hunt. Cf. *Gilliam v. Commonwealth*, Ky., 652 S.W.2d 856, 858 (1983).

■ Second, appellant asks for an expert "to show that death qualified juries are

unconstitutionally more conviction prone than other juries." It is admitted that the expert sought had published works on the subject, and we see no way his personal attendance at a hearing, if any could be held, would enhance his treatises. The court sustained a motion to provide the defendants with a ballistic expert and a toxicologist. We find no abuse of discretion in denying either the statistician or the expert on death qualified jurors. The standard has been determined in this Commonwealth in the case of *Young v. Commonwealth*, Ky., 585 S.W.2d 378, 379 (1979), to be that the experts must be "reasonably necessary." We see no reasonable necessity for these two experts in the instant case.

Although the transcript of the voir dire consumed some 860 pages, appellant complains that he was prejudicially harmed by the exclusion of several questions he desired be asked of the jurors. An examination of the record indicates that the excluded questions were either redundant, irrelevant or improper and no error occurred. Also, during voir dire, counsel for appellant's co-defendant went into questioning failure of his client to testify, suggesting that one reason might be that he did not want "to testify against his brother," the appellant herein. No objection was made by appellant to this question and, if any error existed, it was quickly cured by an admonition from the court. We find no error in this.

Again complaining about voir dire, appellant argues that it was error to excuse a juror for cause who said, "One of the defendants is the son of an ex-employee and fellow worker of mine and I wouldn't want to sit in judgment of that case." This complaint is patently absurd. Even the Commonwealth is entitled to "a tolerably fair trial."

Having disposed of the jury selection phase of the trial, appellant moves on to the guilt phase. He first argues that the mere mention of the word "polygraph" constitutes reversible error. This allegation and the subsequent allegation concerning search of a trailer require a factual background. The most devastating witness in this action was appellant's girlfriend, Linda Rose. She testified that she had accompanied appellant and his half-brother, the co-defendant, Burnell, to the Minit Mart, where the two men left their parked car and entered the store, appellant having a gun in his possession. She heard gunshots, the two men returned to the car carrying three small bags and another bag which contained a dummy camera taken from the store. Appellant told Linda that he had shot the clerk twice. The three drove to a pond, where the men threw the camera into the water, and on the next day Linda moved in with the appellant into a trailer which appellant had rented for himself and his "wife."

Three days later, appellant and Linda learned of Burnell's arrest and, according to Linda, appellant left the trailer with two guns in a white plastic sack, returning without them. In addition to her totally destructive testimony, Linda gave the police her consent to search the trailer, where money and food stamps which were subsequently identified as coming from the Minit Mart were found. She took them to the pond where the camera was recovered, and personally dug up the guns, one of which was determined to be the murder weapon, and gave them to the police.

Linda Rose was taken into custody shortly after the murder, both for suspicion of having taken a gun from her father (which she had), and suspicion of being connected with the murder. In an effort to discredit the testimony of Linda Rose, counsel for Burnell questioned one of the officers exhaustively, which officer, parenthetically, was the officer who had been present when a polygraph examination was administered to Linda. This latter fact was known to counsel for both appellant and Burnell. Defense counsel, being aware that Linda was, in fact, a suspect at one time, and apparently seeking to imply that her testimony was tainted because a deal had been struck, engaged in the following dialogue with the witness:

X23 When did you conclude, if you did, that Ms. Rose was not involved in the crime or have you made that conclusion?

A Yes, sir, I'd say after talking to her in Frankfort.

X24 At that time you were in fact waiting to interrogate the Defendant Burnell and then decided not to; isn't that true?

A At what point, sir?

X25 At the time that you interrogated Miss Rose—

A In Frankfort?

X26 Yes, sir.

A No, sir, that was not my decision up there. The polygraph examiner said he could not—

THE COURT:

Mr. Estes, just confine it to yes or no.

A No, sir.

■ We cannot construe this indefinite, ambiguous reference to the "polygraph examiner" as prejudicial error. There was no statement that any test had ever been administered or, if so, to whom it had been administered. Even the words "said he could not ..." seem to imply that no test was given. The mere mention of the words "polygraph" or "polygraph examiner" is not fatal, per se. There must arise a clear inference that there was a result and that the result was favorable, or some other manner in which the inference could be deemed prejudicial. *See* 29 Am. Jur.2d § 831, p. 925.

■ Also, the search of the trailer was not invalid. It should be noted that the most damning evidence—the gun and the dummy camera—were not the fruits of any search of the trailer. All the evidence—that of Linda Rose and the officers—evinces the inescapable conclusion that her rights were clearly given to her and that she voluntarily consented to the search. *See Sanders v. Commonwealth,* Ky., 609 S.W.2d 690 (1980), and *Commonwealth v. Sebastian,* Ky., 500 S.W.2d 417 (1973). Although appellant contends that Linda did not have standing to give con-

sent, we do not agree. It is uncontradicted that appellant rented the trailer to consummate his live-in arrangement with Linda, referring to her as his wife in dealing with the landlord. Linda testified that she had moved in with her clothing, her stereo, and her father's gun. Consent may be given by anyone who has "common authority over or other sufficient relationship to the premises ... sought to be inspected." *Sanders v. Commonwealth,* Ky., 609 S.W.2d 690 (1980); *Butler v. Commonwealth,* Ky., 536 S.W.2d 139 (1976); *U.S. v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). The common authority and relationship herein clearly sufficed to meet the test.

■ Appellant's next argument is totally offensive to the court. As a part of its evidence, the Commonwealth introduced the father of the victim. He testified that his daughter was 22 years of age at the time of death, had graduated from Eastern Kentucky State University, was working to secure funds to complete her Master's Degree at Morehead State University and that she died January 17, 1980. Appellant contends that this evidence was shocking, sensational, provoked anger, inflamed the jury, aroused sympathy or hostility and should have been excluded, since everyone knew that Becky O'Hearn was dead. There is no contention herein that the witness was emotional, condemnatory, accusative or demanding vindication. It would, of course, behoove the appellant to be tried for the murder of a statistic, but we find no error in bringing to the attention of the jury that the victim was a living person, more than just a nameless void left somewhere on the face of the community.

■ Finally, appellant declares eleven errors connected with the penalty phase of the trial. First, appellant complains that error was committed by the court in admitting evidence pertaining to previous convictions, viz., pandering and third degree burglary. This precise question was disposed of in *Gall v. Commonwealth,* Ky., 607 S.W.2d 97, cert. denied 450 U.S. 989, 101

S.Ct. 1529, 67 L.Ed.2d 824 (1981), when the court stated:

> ... The stipulated synopsis of prior felony convictions was relevant only because one of the mitigating circumstances listed by KRS 532.025(2)(b) was, "The defendant has no significant history of prior criminal activity." Only by proving the criminal history of a defendant can the Commonwealth preclude defendant's reliance upon this particular mitigating circumstance.

The instruction of the lower court concerning this subject was excellent and the jury was informed that they, in considering the penalty, could decide whether the appellant had a significant history of prior criminal activity when they considered the mitigating circumstances.

■ Appellant further contends that it was reversible error to refuse to strike one juror, Leo Johnson, for cause, which refusal occasioned the use of a peremptory challenge. The record discloses that appellant subsequently exhausted all his peremptory challenges. This contention by the appellant is founded on several statements by Mr. Johnson.

The juror first stated, on voir dire, that he knew four of the two dozen witnesses, viz., Linda Rose, two police officers, and the chief of police. However, upon questioning by appellant's trial counsel, it evolved that his acquaintance with Linda Rose was less than a speaking acquaintance, and it was further brought out by that attorney that Mr. Johnson would not give more credibility to the sworn testimony of the policemen than that of any other witness under oath.

During voir dire, the juror admitted that he had discussed the case and formed an opinion about the guilt of the defendant. Upon questioning by appellant's trial counsel, the juror stated, "... that's all gone by. I would have to decide in my heart on the facts that are brought out here."

The juror also stated that any defendant should be required to prove his innocence. The trial judge then instructed the juror that under the law all defendants are presumed innocent and that the duty is upon the Commonwealth to prove guilt. Mr. Johnson thereupon informed the court that he understood this principle of law and that he would abide by it.

Under these circumstances, we found no abuse of discretion by the trial judge in refusing to dismiss the juror for cause.

The other alleged errors pertaining to the sentencing phase, or those not specifically mentioned pertaining to any other phase of this trial, including the alleged unconstitutionality of the death penalty, are without merit.

■ Pursuant to KRS 532.075, we have reviewed the death sentence imposed herein. It is our opinion that this sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor and that the evidence supports the finding of an aggravating circumstance. The sentence was imposed by the jury herein, and the trial judge is entitled to give weight to the recommendation of the jury. *See Gall, supra.*

■ We have considered whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, as required by statute, and have therefore considered the circumstances of the crime committed here and all evidence surrounding the appellant and his background. The information used in considering this penalty has been compiled in accordance with KRS 532.075(6)(a), (b), (c). We have considered all the cases in which the death penalty was imposed after January 1, 1970, as follows: *Scott v. Commonwealth*, Ky., 495 S.W.2d 800 (1972); *Leigh v. Commonwealth*, Ky., 481 S.W.2d 75 (1972); *Lenston and Scott v. Commonwealth*, Ky., 497 S.W.2d 561 (1973); *Call v. Commonwealth*, 482 S.W.2d 770 (1972); *Caldwell v. Commonwealth*, Ky., 503 S.W.2d 485 (1972); *Tinsley and Tinsley v. Commonwealth*, Ky., 495 S.W.2d 776 (1973); *Galbreath v. Commonwealth*, Ky., 492 S.W.2d 882 (1973); *Caine and McIntosh v. Commonwealth*, Ky., 491 S.W.2d

824 (1973); *Hudson v. Commonwealth,* Ky., 597 S.W.2d 610 (1980); *Meadows v. Commonwealth,* Ky., 550 S.W.2d 511 (1977); *Self v. Commonwealth,* Ky., 550 S.W.2d 509 (1977); *Boyd v. Commonwealth,* Ky., 550 S.W.2d 507 (1977); *Smith v. Commonwealth,* Ky., 599 S.W.2d 900 (1980); and *Gall v. Commonwealth,* Ky., 607 S.W.2d 97 (1980).

Our comparative study of these cases and the circumstances in this case leads us to the inevitable conclusion that the sentence of death here imposed is neither excessive nor disproportionate to the penalty imposed in the enumerated cases.

The judgment is affirmed.

All concur except LEIBSON, J., who dissents and files a dissenting opinion.

LEIBSON, Justice, dissenting.

There are three errors that occurred during the trial so significant that this conviction should be reversed. Although the evidence of guilt was overwhelming, it is by no means certain that McQueen would have received the death sentence had these errors not occurred.

First, Juror Sherry Winkler was improperly excused. Apparently, as the trial progressed the trial judge received reports and suggestions from the prosecutor and from unidentified sources impugning her integrity as a juror. She was excused on the basis of rumor and gossip, what could best be described as "scuttlebutt."

There was a continuing controversy during the trial as to whether she had answered the *Witherspoon* question with integrity, but absolutely no proof that she had failed to do so. The evidence that she had failed to observe the court's instructions not to discuss the case with others was equally lacking. At most it suggested she had been approached by others and made noncommital responses. Nevertheless the trial court elected to excuse her at the close of the prosecutor's case. The trial court stated:

"I think that she has created enough problems on it and obviously she has had some kind of conversations of people saying, oh, are you in the jury, I didn't think you would be on it, or some such thing as that. Whatever, whatever she intended the impression that has been conveyed is that she, basically, had her fingers crossed when she was qualified to serve as a juror."

There is nothing in the record to support these conclusions or the action of the trial judge in excusing this juror. In the pervasive atmosphere of a trial, there is some likelihood that the remaining jurors would pick up the undertone that Juror Winkler was excused because she might not be willing to give McQueen the death sentence. A death sentence administered in such circumstances should not stand.

Next, the trial court erred in refusing to strike Juror Leo Johnson for cause during voir dire. There is no way Mr. Johnson could have been considered an acceptable juror after he testified that he was a former neighbor and speaking acquaintance of Linda Rose, a key witness, and a longtime friend of one police officer and close personal friend of another, who were involved in the case as potential witnesses and obviously interested in the outcome. Further he testified he was familiar with the facts of the case and, as a customer of the business where the crime occurred, was more interested in the case than he would otherwise have been. He admitted that he had discussed the case and that he had formed an opinion about the guilt of the defendant. His answers to questions asked to establish that he intended to be fair and impartial regardless of prior knowledge, friendships and opinions simply substitute form for substance. The constitutional right to a fair trial by an impartial jury should be protected by this Court as a matter of substance. U.S. Constitution, Sixth Amendment; Kentucky Constitution, Sec. 11.

Speaking of the need to select impartial jurors, rather than simply to rehabilitate for the record jurors who could not possibly be impartial because of their background, in *Irvin v. Dowd,* 366 U.S. 717, 81

S.Ct. 1639, 6 L.Ed.2d 751 (1961), the United States Supreme Court said:

> "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference ... procedure is not chained to any ancient and artificial formula."

366 U.S. at 724–25, 81 S.Ct. at 1643–44.

*Irvin v. Dowd, supra,* stands for the proposition that a question designed to extract from a prospective juror a promise that he will put aside his preconceptions and try the case fairly is not sufficient basis for us to disregard the obvious in deciding whether the juror can in fact be impartial.

Similar circumstances caused us to reverse *Pennington v. Commonwealth,* Ky., 316 S.W.2d 221 (1958). In *Pennington* we said that "credulity would be stretched to the breaking point to say that the juror's close relationship to Mosley (the principal witness) ... does not practically, or within limits of reality, bring the juror under the classification of being impliedly or presumably biased so as to support a challenge for cause." 316 S.W.2d at 223.

Finally, the Commonwealth should not have been permitted to introduce evidence of McQueen's prior criminal history, convictions for pandering and third-degree burglary, as it did during the penalty phase in this case.

The death penalty should not be imposed by the jury because of the defendant's prior criminal history, but because of the aggravated nature of the offense. KRS 532.-025(2)(a) specifies the "aggravating circumstances" for the jury to consider and prior criminal history is not one of them.

I am aware that this Court affirmed the sentence of death in *Gall v. Commonwealth,* Ky., 607 S.W.2d 97 (1980), where prior criminal history was admitted, but in *Gall* such evidence was "admitted by stipulation." 607 S.W.2d at 111. Here the appellant objected to the introduction of this evidence and such objection should have been sustained. We should make it clear that *Gall* is limited to its facts and not

authority for the Commonwealth to introduce prior criminal history as part of its case during the penalty phase of a capital case.

The Commonwealth halfway concedes the point at issue by arguing that the reason for permitting such evidence in this case was in anticipation of a defense request for an instruction on "no significant history of prior criminal activity" as a mitigating circumstance. KRS 532.025(2)(b)(1). The simple answer to this position is that the defense is not entitled to such an instruction absent evidence to support it and had the defense offered any such evidence in this case, then (and only then) the Commonwealth is justified in offering prior criminal history in rebuttal.

Here the Commonwealth managed to bootstrap in before the jury prior criminal history intended solely to aggravate the jury under the pretext that it would rebut mitigating evidence that was not forthcoming. The fact that the jury was later instructed that "no significant history of prior criminal activity" would be a mitigating circumstance, were it true, served only to aggravate the situation even more.

Although no Kentucky cases have yet addressed this issue, other jurisdictions have held in death cases that "(t)he burden of establishing the existance of any mitigating circumstance is on the defendant." *State v. Ceja,* Ariz., 565 P.2d 1274, 1276 (1977). In *Maggard v. State,* Fla., 399 So.2d 973 (1981), the Florida Supreme Court reversed a conviction where the prosecution introduced evidence of prior criminal history offered in advance to "rebut" in circumstances similar to the present case. The Florida Supreme Court said:

> "Mitigating factors are for the defendant's benefit, and the State should not be allowed to present damaging evidence against the defendant to rebut a mitigating circumstance that the defendant expressly concedes does not exist." 399 So.2d at 978.

In the present type of situation there should be no instruction on absence of "sig-

nificant history of prior criminal activity" as a mitigating circumstance and "neither the State nor the defendant should be allowed to argue to the jury the existence or the nonexistence of such mitigating circumstance." *Maggard v. State*, 399 So.2d at 978.

The question before us is not whether we believe the death penalty was appropriate in this case, but whether we believe McQueen was tried, convicted and sentenced according to law and by an impartial jury. In my view he was not. Therefore I would reverse the conviction and order a new trial.