# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

**THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.**

RENDERED: APRIL 24, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2024-SC-0081-MR

COCINA PENN     APPELLANT

V.

ON APPEAL FROM MCCRACKEN CIRCUIT COURT
HONORABLE WILLIAM ANTHONY KITCHEN, JUDGE
NO. 22-CR-01038

COMMONWEALTH OF KENTUCKY     APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Cocina Penn was convicted of murder and sentenced to life in prison. Penn now appeals the decision of the McCracken Circuit Court. For the following reasons, we affirm.

## I. BACKGROUND

On October 4, 2022, at 4:44 a.m., 911 dispatchers received a call from Carl Penn, the adult son of Penn and her husband, Robert Penn. Carl, who was living with his parents at the time, told the 911 dispatchers that his mother had awakened him because his father was laying in the street outside of their residence in Paducah, Kentucky and he appeared to have been stabbed. After waking Carl, Penn went over to Tony Jones' neighboring

residence and asked Tony to call 911, because her cell phone was missing.[1] Tony's mother called 911.

Police officers quickly arrived on the scene and found Robert in the street surrounded by large amounts of blood. Penn was also on the scene, having returned after asking Tony to call 911. Officer Julia Cross began to perform CPR on Robert. Ofc. Cross noted that Robert was not responding to her CPR efforts, his eyes were unmoving, and his extremities showed signs of rigor mortis.[2] The EMTs[3] arrived on the scene soon after Ofc. Cross started CPR on Robert. They took over CPR and were about to place a defibrillator on Robert when they lifted his shirt and discovered that he had been eviscerated.[4] Nonetheless, the EMTs continued to administer CPR, because it was their protocol to continue CPR until paramedics arrive at the scene.

Kenny Wilson, a paramedic with Mercy Regional EMS Ambulance of Paducah, testified at trial that there were obvious signs Robert was already deceased: he was not breathing, he suffered a severe injury to his abdomen,

---

[1] There was testimony at trial from multiple officers that they were informed they were responding to a suspected robbery, that cell phones were missing, and that someone had been stabbed. Based on certain objections made at trial, we believe that Penn was the one who reported the scene as a robbery. There was no testimony at trial that explicitly discussed this, however.

[2] Rigor mortis is the third stage after death, in which the muscles harden and become stiff, caused by the lack of adenosine triphosphate (ATP), which gives energy to the muscles. Medicine Net, *What is Rigor Mortis?*, https://www.medicinenet.com/what_are_the_stages_of_rigor_mortis/article.htm (last visited March 24, 2015).

[3] Emergency Medical Technicians.

[4] Robert's small intestine was protruding from a large gash on his abdomen.

his neck had been severely cut, his wrists were deeply wounded, his body showed signs of rigor mortis, and he was pale and cold to the touch.

Police officers began to secure the surrounding area. They discovered a security camera mounted on the residence of another neighbor, Michael Waters. The camera pointed towards the street where Robert had been found. The officers asked Michael if his security camera had been recording that early morning, and Michael told them that the camera recorded motions and audio. He stated that he could use his cell phone to view any activity the security camera might have picked up. After checking his cell phone, Michael told the officers that his camera had recorded activity around 3:10 a.m.—about an hour and a half before either of the 911 calls were made. The recording ended around 3:13 a.m. Detective Dylan Cook later returned to Michael's residence, and had Michael send him the video via e-mail. The video depicted two figures running into the frame from the right moving towards the left in the direction of the Penn residence. The figure in front was much larger than the figure in the back. A man's voice can be heard screaming either "don't, baby, don't . . . no, baby, no" or "run, baby, run."[5] Later in the video, the same male voice can be heard pleading for help. At trial, Kevin Penn, Robert's and Penn's second adult son, testified that the male voice in the recording was his father's and that Robert always called Penn "Baby."

---

[5] The audio is somewhat unclear. The Commonwealth presented to the jury during its opening argument that the voice was yelling "don't, baby, don't" while the defense asserted during its closing argument that the voice was yelling "run, baby, run."

3

In addition to their investigation of the scene, officers began the process of "pinging"[6] Penn's and Robert's missing cell phones.[7]  The officers made an inquiry to Verizon, the carrier of the phones, as to where the phones were located.  Verizon then tracked the phones and sent the officers any "pings" the phones made, indicating their location.  Robert's cell phone was not able to be located, but Penn's cell phone was located within the vicinity of a landfill in Mayfield, Kentucky—about 30 minutes away from Paducah.  However, the officers did not search the landfill because over 100 tons of waste had been dumped that day by the time they received the phone's location.

Detective Kevin Wilson testified that Robert's body had been found approximately 154 feet south of a footbridge that led from the Penns' residential neighborhood into a semi-wooded area.  Det. Wilson began his investigation at the footbridge because he had been informed by other officers on the scene that there was blood found on the footbridge.  He walked south away from the footbridge towards where Robert had been found, noting that there was blood on the leaves and grass near the footbridge.  Det. Wilson then walked back towards the footbridge, crossed it, but found no evidence on the other side of the footbridge.

---

[6] Pinging a cell phone involves sending a signal to it in order to determine the cell phone's location.

[7] The initial 911 dispatch message had informed officers that they were responding to a potential robbery where cell phones had been stolen and that someone had been stabbed.  That information prompted the officers to ping the cell phones, which can only be done in life threatening situations.

4

After investigating the footbridge, Det. Wilson and other officers executed a search warrant on the Penn residence. They found blood smeared on the front exterior door, and on a kitchen cabinet. A single wet washcloth was found in the washing machine, and a knife was discovered in the bathroom.[8] Officers searched the P-trap[9] located underneath the kitchen sink and noted that it smelled like bleach. Swabs and samples were taken from all the blood found in the Penn residence, on the street near Robert, the footbridge and surrounding area.

K-9 Officer Andrew Parish responded to the scene around 5 a.m. He testified that he was responding to what was initially a suspected robbery, which is why the K-9, who was trained to track people, was used. Ofc. Parish started his search for a potential suspect on the south side of the footbridge, and then tracked across it to the north side. His K-9 stopped tracking once they crossed the bridge. Ofc. Parish testified that if there had been any human scent on the north side of the footbridge his K-9 would have kept tracking the area.

While the police officers were conducting their investigation of the scene, Penn was taken to the hospital to be evaluated. Detective Chelsee Breakfield testified that she spent most of October 4, 2022, at the hospital with Penn. Det. Breakfield took pictures of Penn while at the hospital to document Penn's

---

[8] It is not believed that this was the knife used to kill Robert.

[9] The detachable U-shaped portion of a pipe located underneath a sink that catches debris or other foreign objects.

appearance. Penn had cuts on her fingers and hands. Penn also had a cut on her back—however, there was no corresponding cut to Penn's shirt where the cut was located on her back.[10] Penn also had blood in her left ear and blood stains on her pants. After officers obtained a search warrant for DNA, multiple swabs were taken from Penn, including the blood in Penn's ear, the inside of her cheeks, and her fingernails. Samples from her bloody clothes were also taken for testing. Penn was arrested around 10 a.m. on October 4, 2022.

The swabs and samples taken from the scene and Penn were sent to a laboratory for DNA testing. The blood found on Penn's pants matched samples that were taken from Robert, as did the blood found on the footbridge and the door frame of their residence. The blood swab from the street and the kitchen cabinet matched Penn. The blood swab taken from Penn's ear matched both herself and Robert.

It was not until after Penn's arrest that officers received information regarding a potential romantic affair occurring between Penn and a man named William Tabor. At the time of Robert's murder, Tabor was living with his now ex-girlfriend, Kathleen Krencis, in Paducah, Kentucky. Ms. Krencis testified at trial that she had started to have suspicions that Tabor was hiding something from her because he began to hide his phone. About two days prior to Robert's murder, Ms. Krencis decided to check Tabor's phone while he was asleep. She found messages and sexually explicit photos and videos sent to

---

[10] In its closing argument, the Commonwealth presented the theory that Penn had used the knife in the bathroom to cut herself to stage the scene.

6

Tabor from Penn.  On October 2, 2022, Ms. Krencis sent Penn a text message detailing that she was aware of the affair between Penn and Tabor, and threatened to tell Robert about it if Penn did not tell him herself.  Ms. Krencis testified that Tabor was home with her the entire night and early morning of October 4, 2022, because she was taking a medication at the time that had her up every hour of the night and Tabor was there each time she woke up.

Tabor testified at trial that the affair between him and Penn began in January 2022.  They would meet on his lunch breaks and at Penn's place of work in the early mornings.  Tabor stated that he thought he always deleted any evidence of the affair off his phone every day after work.  However, Sergeant Jordan Murphy was able to extract information from Tabor's cell phone which included a screenshot of a message that was sent on Facebook Messenger from Penn to Tabor.  The message read

> I sure can't stand his ass I hate his fucking guts[.]  I'm saving up money[.]  There was me and you [t]o get together because it won't be long[.]  I'm hoping I will eventually find somebody, you know, you know what I mean, and then he'll be gone[.]  I love you so much baby.

Det. Breakfield conducted an interview with Tabor at some point after the officers were notified of the affair.  Tabor testified that he told Det. Breakfield during his interview with her that Penn told him she was going to hire someone to "bump him off."  Penn did not specify to Tabor who she meant by "him," but it was implied she meant Robert.  Tabor also told Det. Breakfield about a time when Penn had approached him at his place of work and said that she would find someone to "do away with him"— "him" meaning Robert.  Tabor testified

7

that he thought Penn was just joking when she made those comments, but he never mentioned that in the interview he gave to Det. Breakfield.

Tabor testified that he was home during the time of Robert's murder, but around 6 a.m. that morning he had gone to Penn's place of work to meet her. When she did not show up, he proceeded to drive to Penn's residence but saw that there was a white sheet covering what appeared to be a body in the road near her house. Tabor testified he thought that the sheet was covering Penn at first but later found out that it had been Robert. When asked if he had anything to do with Robert's murder, Tabor responded that he did not. Tabor testified that he knew Robert, that he had an amicable relationship with Robert, and that he was not the person Penn was referring to in the statements she made about finding someone to kill Robert.

The Commonwealth presented additional testimony at trial from a friend of Penn's, Michael Overby. He testified that Penn had approached him at his place of work in early September 2022. Penn asked him if he knew how to obtain a firearm, and he told her that he did not mess with guns. Michael testified that was the extent of the conversation.

While Penn exercised her right to not testify during her trial, defense counsel argued during its closing argument that someone had attacked and robbed both Robert and Penn, and the police officers failed to sufficiently follow that lead during their investigation. Defense counsel suggested to the jury that the person responsible for Robert's death was a third party who wanted Robert "out of the picture"—a third party like Penn's secret lover, Tabor. The jury was

8

instructed on murder and found Penn guilty. She was sentenced to life imprisonment and now appeals her conviction. Additional facts will be developed as necessary.

## II. ANALYSIS

On appeal, Penn raises three issues, each is unpreserved. Penn has requested review under our palpable review standard. She first argues that Dr. Christopher Kiefer, the medical examiner who performed Robert's autopsy, gave improper opinion testimony during trial and the Commonwealth improperly relied on that testimony in its closing argument. Second, Penn argues that the Commonwealth committed prosecutorial misconduct when it rebutted her defense during its closing argument. Lastly, Penn asserts that the alleged errors amount to cumulative error.

1. **It was not palpable error for Dr. Kiefer to testify about the significance of the facial wounds he examined on Robert, or for the Commonwealth to discuss Dr. Kiefer's testimony in its closing argument.**

Penn argues that the trial court erred when it allowed Dr. Kiefer to testify that if a victim sustains injuries to the face that is indicative of a long term or romantic relationship between the victim and the perpetrator, or that there was charged energy between the two. She contends that the testimony was improper opinion testimony pertaining to the habits of a particular subset of individuals, and that the Commonwealth improperly emphasized that testimony during its closing argument. Because Penn failed to preserve this

9

argument for appellate review, she asks this Court to review the argument pursuant to RCr[11] 10.26 for palpable error.

A palpable error is one that affects an individual's substantial rights and "may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." RCr 10.26. "A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). "That means that if, upon consideration of the whole case, a substantial possibility does not exist that the result would have been different, the error will be deemed nonprejudicial." *Graves v. Commonwealth*, 17 S.W.3d 858, 864 (Ky. 2000).

At trial, Dr. Kiefer described the process he followed while performing Robert's autopsy on October 5, 2022. All throughout the autopsy, Dr. Kiefer, or someone else at his direction, took photographs to document Robert's body and injuries. Dr. Kiefer described the injuries Robert sustained, including extensive stab wounds and multiple defense wounds to his hands and wrists.[12]

---

[11] Kentucky Rule of Criminal Procedure.

[12] While some of the injuries Robert suffered to his wrist could have been self-inflicted, there was nothing else from Robert's autopsy or the crime scene that indicated Robert had died by suicide.

10

Dr. Kiefer determined that Robert's immediate cause of death was either the severing of his windpipe or carotid artery,[13] as either injury would be fatal.

Dr. Kiefer testified about the multiple injuries Robert had suffered to his face, particularly to his forehead and lower lip. The Commonwealth asked Dr. Kiefer several questions regarding those injuries, including these two:

> **The Commonwealth**: Is there anything significant in your practice, your profession, as far as injuries to the face, as far as the work that you do and the conclusions that you draw?
>
> **Dr. Kiefer**: There is a connection between stab wounds or sharp force trauma in the face and the two people, the person performing or committing the act and the recipient, so the victim.
>
> **The Commonwealth**: How so? What is that relationship, or what does it suggest in your professional opinion?
>
> **Dr. Kiefer**: It usually suggests that they've been a couple for years, or they've got some very highly charged . . . they're in a relationship is what that means.

This testimony did not elicit an objection at trial. During its closing argument, the Commonwealth referred to the testimony given by Dr. Kiefer when it stated, "This is no robbery. What did Dr. Kiefer say? These injuries? These are injuries of passion. The injuries to the face? What did he say about that? He says, 'This suggests intimacy. This suggests familiarity. This suggests a relationship, a relationship that had lasted for some time.'" Defense counsel did not object to the Commonwealth's argument.

---

[13] The carotid artery is a major artery located in the neck. It supplies blood and oxygen to the brain. Cleveland Clinic, Carotid Artery, https://my.clevelandclinic.org/health/body/21492-carotid-artery (last visited March 20, 2025).

"A party may not introduce evidence of the habit of a class of individuals either to prove that another member of the class acted the same way under similar circumstances or to prove that the person was a member of that class because he acted the same way under similar circumstance." *Ordway v. Commonwealth*, 391 S.W.3d 762, 776 (Ky. 2013) (citing *Miller v. Commonwealth*, 77 S.W.3d 566, 572 (Ky. 2002)). In *Ordway*, the Appellant was convicted of capital murder for the deaths of two men. *Ordway*, 391 S.W.3d at 762-63. He claimed he killed the two men in self-defense. *Id.* At the Appellant's trial, an investigating detective testified that the "Appellant did not act like those who had lawfully protected themselves but, had instead acted like those who were fabricating a self-protection defense." *Id.* at 775. This Court determined that the detective's testimony "was clearly devastating to Appellant's claim of self-defense." *Id.* at 777. "Detective Wilson's testimony contrasting his opinion on the habits of suspects who, as a class, have truthfully invoked the defense of self-protection against the class of those who have lied about it, and how Appellant's post-shooting conduct was consistent with the latter, should have been excluded as improper opinion testimony and irrelevant." *Id.* at 776. The Detective's testimony was not harmless, and the Appellant's murder conviction was reversed. *Id.* at 776-77.

Penn urges this Court to take the stance it did in *Ordway*. However, her case is distinguishable from *Ordway* for multiple reasons. First, the Appellant in *Ordway* objected to the detective's testimony, but the trial court overruled his objection. *Id.* at 775. Therefore, the question in that case was whether the

trial court erred when admitting the detective's testimony and whether that error was harmless. *Id.* The question here is whether the admission of Dr. Kiefer's testimony constituted palpable error—a much higher standard than harmless error. *Commonwealth v. Rieder*, 474 S.W.3d 143, 146 (Ky. 2015).

Second, the detective's "testimony in *Ordway* was more extensive than in the present case." *Id.* It was permissible for the detective in *Ordway* to testify about "how persons who legitimately exercise the right of self-protection typically behave," but he took that testimony a step too far by concluding that the Appellant did not act like a person who had lawfully protected himself but rather as someone who had fabricated a self-protection defense. *Id.*; *Ordway*, 391 S.W.3d at 775. The testimony "in effect, urged the jury to depend upon [the detective's] expertise as a police officer and his perception and opinions about matters outside the realm of common knowledge." *Ordway*, 391 S.W.3d at 776-77. Thus, the testimony was improper. *Id.*

Here, Dr. Kiefer did not give his opinion regarding Penn's guilt like the detective did in *Ordway*. He never gave any specific testimony regarding Penn—he only testified that his professional training usually suggests a correlation between certain facial wounds inflicted on a homicide victim and the relationship between the victim and the perpetrator. *Compare Nugent v. Commonwealth*, 639 S.W.2d 761, 764-65 (Ky. 1982) (reversing the defendant's murder conviction due to erroneously admitted opinion testimony from a witness who was asked if the defendant "dropped the hammer on the victim" and replied, "I think he did, you know if you want the honest to God truth.");

13

*McGuire v. Commonwealth*, 595 S.W.3d 90, 95 (Ky. 2019) (holding that a police officer's opinion, based on his experience, that the evidence recovered was consistent with drug trafficking and not personal use was admissible because his testimony did not discuss the defendant's guilt).

Third, Dr. Kiefer testified about his process for conducting Robert's autopsy and what his findings were in the context of his specialized knowledge as a forensic pathologist. According to KRE[14] 702, expert testimony is admissible when the expert's "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." While Penn would argue that Dr. Kiefer's testimony was inherently incompetent because it suggested that Penn specifically targeted Robert's face due to their relationship status, Dr. Kiefer only testified about the pattern that facial stab wounds present based on his forensic training and experience conducting autopsies. His testimony indicated that, in the context of a homicide, injuries to the face demonstrate that a high amount of charged energy would have been present in the situation, and that indicates the victim and the perpetrator have a relationship.[15] The information provided by Dr. Kiefer would assist the jury pursuant to KRE 702.

---

[14] Kentucky Rule of Evidence.

[15] In *Turner v. Commonwealth*, the Appellant was convicted for the murder of his father. 5 S.W.3d 119, 121-22. While in the emergency room, Appellant's father made a statement that identified Appellant as his killer—his statement was overheard by Patricia Keen. *Id.* Based on the testimony of Patricia, the statement was admitted into evidence as a dying declaration. *Id.* On appeal,

Appellant further asserts that Patricia Keen was not qualified to express an opinion that Bill Turner knew he was going to die when he identified

Lastly, the Commonwealth presented substantial evidence of Penn's guilt. *Rieder*, 474 S.W.3d at 146. There was a video, albeit poor quality, that showed two figures running south in the direction of the Penn residence where one figure was clearly larger than the other figure giving chase. There was discussion at trial detailing how Robert was a larger man and Penn was a smaller woman. Penn's own son testified that the man's voice heard in the video belonged to Robert, and that Robert called Penn "Baby." Robert's voice in the video is arguably saying "don't, Baby, don't!". Det. Breakfield testified that the wounds Penn had on her hands were consistent with the wounds found on other assailants who stab their victims—the presence of blood and the amount of force an assailant uses while stabbing would cause their hands to slip up to the sharp part of the knife. Det. Breakfield also testified that while she had expected to find more wounds on Penn, it would be very unlikely that the two people in the video would be anyone other than Robert and Penn. The jury was free to believe that the two figures in the video were Robert and Penn.

The Commonwealth also presented evidence that suggested Penn not only disliked Robert but had contemplated his murder in the months leading

Appellant as his assailant. The decision as to the qualifications of an expert rests in the sound discretion of the trial court. *Ford v. Commonwealth*, Ky., 665 S.W.2d 304, 309 (1983), *cert denied*, 469 U.S. 984, 105 S.Ct. 392, 83 L.Ed.2d 325 (1984). In fact, the qualification requirement is itself a rule of evidence, KRE 702; and, to reiterate, a trial judge is not bound by the rules of evidence in ruling on the admissibility of evidence. KRE 104(a). Any possible error arising from the fact that Keen rendered her opinion in open court was harmless, since her opinion did not go to the issue of Appellant's guilt or innocence, but only to whether Bill Turner's statement was a dying declaration, an issue to be decided by the judge, not the jury.

*Id.* at 123.

up to October 4, 2022. Furthermore, Ms. Krencis had threatened to tell Robert about Penn's affair just two days before his death. Therefore, Dr. Kiefer's testimony was not palpable error as it did not result in manifest injustice and "did not create the 'probability of a different result or error so fundamental as to threaten [Penn's] entitlement to due process of law.'" *Id.* at 147 (quoting *Martin*, 207 S.W.3d at 3).

Penn contends that it was error for the Commonwealth to rely on Dr. Kiefer's testimony during its closing argument. This issue is also unpreserved and will be reviewed under RCr 10.26 for palpable error. "[A] prosecutor is permitted wide latitude during closing arguments and is entitled to draw reasonable inferences from the evidence." *Commonwealth v. Mitchell*, 165 S.W.3d 129, 132 (Ky. 2005). "The longstanding rule is that counsel may comment on the evidence and make all legitimate inferences that can be reasonably drawn therefrom." *Padgett v. Commonwealth*, 312 S.W.3d 336, 350 (Ky. 2010) (citing *East v. Commonwealth*, 249 S.W.2d 137, 139 (Ky. 1933)).

The Commonwealth was free to use what was discussed during trial in its closing argument. Additionally, much of its closing argument rested on the other substantial evidence it presented during trial. The Commonwealth explained how Tabor was not involved in Robert's murder, how Ms. Krencis had no reason to lie for her ex-boyfriend, and how Robert would never have expected his wife to attack him despite the measures she took seeking to facilitate his murder. The Commonwealth also focused much of its closing argument explaining how the surveillance video showed two figures running,

16

one of which was too small to ever be Tabor. It was free to suggest to the jury that it did not believe the reason behind Robert's murder was a robbery. There was no manifest injustice created by the Commonwealth's comments on Dr. Kiefer's testimony, and, therefore, we find no palpable error in its comments during closing argument.

2. **It was not palpable error for the Commonwealth to discuss the fact that it was waste pick-up day the same day Robert was murdered during its closing argument.**

Next, Penn argues that the Commonwealth committed prosecutorial misconduct when it rebutted Penn's robbery defense in its closing argument rather than using witness testimony by stating "it was trash pick-up day." At trial, Det. Cook explained how the initial 911 dispatch call indicated there had been a robbery where cell phones were stolen. Based on that information, and the fact that someone had been murdered, the cell phones were tracked in order to determine their locations. Penn's cell phone was located near a landfill.

Steve Harrison, head of Paducah's sanitation department, testified at trial that he gave police officers a record of what was dumped in the landfill where Penn's phone had pinged the day of Robert's murder. Specifically, 185 tons of waste entered the landfill on October 4, 2022. Most was from Paducah, but the landfill accepts waste from surrounding areas. In other words, it would have been impossible for police officers to find Penn's phone in the landfill. During its closing argument, the Commonwealth stated

> [Penn] had time to do other things. Get rid of the cellphones.
> Again, this was no robbery. It happened to be trash pickup day. I

17

wonder if that had anything to do with the plan to kill [Robert] that morning. She had plenty of time to get those cellphones into the trash.

The Commonwealth further stated, "I suggest to you that the knife that was probably used to kill, not the knife that [Penn] used to cut herself, was probably in that landfill but, again, knives don't ping. She had time to get stuff thrown away." Penn argues that the above statements amount to flagrant and reversible misconduct, because they improperly rebut her defense that a robbery had occurred and resulted in Robert's murder. Penn failed to preserve this argument; thus, we will review it under RCr 10.26 for palpable error.

"When reviewing claims of prosecutorial misconduct under our palpable error standard, 'we must focus on the overall fairness of the trial and may reverse only if the prosecutorial misconduct was so improper, prejudicial, and egregious as to have undermined the overall fairness of the proceedings.'" *James v. Commonwealth*, 681 S.W.3d 60, 74 (Ky. 2023) (quoting *Brewer*, 206 S.W.3d at 349). A prosecutor is afforded wide latitude during closing argument, including its ability to draw reasonable inferences from the evidence presented during trial. *Mitchell*, 165 S.W.3d at 132; *Padgett*, 312 S.W.3d at 350.

The Commonwealth did not commit prosecutorial misconduct when it suggested during closing arguments that it was trash pickup day. There was evidence presented at trial that new waste from Paducah had been dumped into the landfill the day Robert was murdered, which reasonably suggests that the waste had been collected that same day. It was not unreasonable for the

18

Commonwealth to make the comment about trash pick-up day considering the evidence presented.

Furthermore, the Commonwealth's comments did not improperly rebut Penn's robbery defense as there had been testimony during trial that suggested police officers stopped treating the situation as a potential robbery in favor of treating it as a homicide. Detective Casey Steenbergen testified that, based on his experience as a Detective, the scene appeared to be a homicide and not a robbery due to the obvious amount of force used against Robert as robbers do not typically use a significant amount of force against their victims. Det. Steenbergen testified that the video footage from Michael's security camera made that notion even more evident in this case. Therefore, it was reasonable for the Commonwealth to present during its closing argument its theory that Robert's murder was not the product of a robbery gone bad. As previously discussed, the Commonwealth had presented a substantial amount of evidence that supported the jury's guilty verdict. As no manifest injustice resulted from the Commonwealth's statements, we find no palpable error.

### 3. There is no cumulative error.

Lastly, Penn contends that her murder conviction should be reversed based on cumulative error. An appellant's conviction may be reversed when individual harmless errors have the cumulative effect of rendering her trial "fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). Here, because there were no errors, cumulative error is not applicable.

19

### III. CONCLUSION

For the foregoing reasons, we affirm.

All sitting. All concur.


COUNSEL FOR APPELLANT:

Steven J. Buck
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General