Eric GILL, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 96–SC–0405–MR.

Supreme Court of Kentucky.

Oct. 21, 1999.

Rehearing Denied Jan. 20, 2000.

Lisa Bridges Clare, Assistant Public Advocate, Department of Public Advocacy, Frankfort, for Appellant.

A.B. Chandler, III, Attorney General of Kentucky, Matthew D. Nelson, Michael Harned, Assistant Attorneys General, Criminal Appellate Division, Office of the Attorney General, Frankfort, for Appellee.

JOHNSTON, Justice.

Eric Gill was convicted of murder and first-degree robbery. He was sentenced to life without the possibility of parole for twenty-five years. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). We affirm.

This is a sad case of brutal and senseless murder. Gill and a number of other teenagers plotted to lure Brad Johnson to an abandoned rock quarry in order to tie him up and steal his car. The plot evolved to include a scenario in which Brad was murdered. The teenagers wanted to steal the car so that they could drive to Florida.

By his own account, Gill and Brad had been friends for a number of years. This friendship was critical to luring Brad to the rock quarry. First, Gill invited Brad over to his house. Then, on the pretext of picking up a stranded friend, Gill helped trick Brad into driving him, Jim Dunn (Gill's co-defendant at trial), and one Jamie Salyers to the rock quarry, which they called Devil's Canyon. Gill took with him

to the rock quarry a duffle bag packed with clothes for Florida. Upon arriving at the rock quarry, Gill, Dunn, and Salyers led Brad along a foot path that led to the top of the quarry, purportedly to look for their stranded friend.

At the top of the quarry, Dunn tricked Brad into giving him the keys to the car. Once he had Brad's keys, Dunn shoved Brad toward the sheer edge of the quarry. Brad managed to stop himself on the slope leading to the edge. As he was climbing back toward the top, back to safety, he became fearful and asked Dunn, "I am going to die, aren't I?"

Dunn did not respond. Instead, he asked Gill, "Are you going to help me?" Gill testified that he understood Dunn to mean whether Gill was going to help him murder Brad.

When he was almost back up the slope, Brad grabbed Gill's leg. According to Salyers' testimony, Gill and Dunn both picked up Brad and again propelled him toward the sheer edge of the quarry. According to Gill, Dunn alone pushed Brad back toward the seventy-five foot drop. In any event, Gill did not help Brad nor did Brad fall off of the edge of the quarry. Instead, he managed to grab hold of a sapling.

Determined to finish the job, Dunn and Gill threw sticks, branches, and rocks at Brad until they finally forced him to lose his grip and fall to the quarry floor. Dunn and Gill then walked to a vantage point where they could view their handiwork and discovered that Brad still lived. Dunn and Gill left Salyers at Brad's car and walked to the bottom of the quarry. Both Dunn and Gill threw rocks at Brad's head, one of which finally ended Brad's short life.

After Brad was dead, Gill rifled through Brad's clothes, retrieved his wallet, removed twenty-one dollars, and then pitched the wallet aside. Instead of going to Florida, Gill and Dunn went to North Carolina, where they stayed briefly and then returned to Kentucky. When they learned that the authorities where looking

for them in connection with Brad's murder, they drove Brad's car to a strip mine and set it afire. The two were arrested shortly thereafter. Dunn quickly confessed to the murder and robbery. However, Dunn did not testify at trial.

### BRUTON VIOLATION

Gill moved *in limine* to suppress the introduction of Dunn's confession, which clearly implicates Gill as a participant in the murder and robbery. Gill argued that introduction of the statement would violate his Sixth Amendment right of confrontation as established in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The Commonwealth responded that, because Dunn's statement was sufficiently corroborated by other evidence, the statement was admissible under the statement against penal interest exception to the hearsay rule. *See Taylor v. Commonwealth,* Ky., 821 S.W.2d 72 (1990), *cert denied,* 502 U.S. 1100, 112 S.Ct. 1185, 117 L.Ed.2d 428 (1992). The trial court found that Dunn's statement was sufficiently corroborated and denied Gill's motion to suppress. As a result of this ruling, Dunn's unredacted confession was admitted as substantive evidence against both Dunn and Gill.

■ At oral argument, the Commonwealth all but conceded that introduction of Dunn's confession violated *Bruton.* Further, rather than defending *Taylor* and the trial court's ruling, the Commonwealth argued that introduction of the confession was harmless error. We agree with the Commonwealth that if Dunn's statement was admitted in error, it was harmless beyond a reasonable doubt. However, while we decline to reach the issue of whether Dunn's confession was admissible as an exception to the hearsay rule under *Taylor,* we note that the continued viability and constitutionality of *Taylor* on this point has been called into serious question by the U.S. Supreme Court's recent 7–0 decision in *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999).

■ Violation of the *Bruton* rule is subject to the harmless error analysis of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which holds "that before a federal constitutional error can be held harmless, the [reviewing] court must be able to declare a belief that it was harmless beyond a reasonable doubt." *See Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284, 288 (1969); *see also Cosby v. Commonwealth,* Ky., 776 S.W.2d 367, 370 (1989), *cert. denied,* 493 U.S. 1063, 110 S.Ct. 880, 107 L.Ed.2d 963 (1990).

The murder instruction for Gill reads:

You will find the Defendant, Eric Gill, guilty of Murder under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt that ... he, alone or in complicity with James Dunn intentionally killed Brad Johnson by pushing him from a cliff, knocking him from a tree and/or throwing a rock(s) at his head.

The definition of "complicity" included in the instructions reads:

*Complicity*—Means that a person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he solicits, commands, or engages in a conspiracy with such other person to commit the offense, or aids, counsels, or attempts to aid such other person in planning or committing the offense.

Upon review of the entire record, we can state with confidence our belief that the evidence against Gill was so overwhelming that the admission of Dunn's statement was harmless beyond a reasonable doubt.

Even if we cast aside the number of witnesses who testified that Gill participated in the plan to lure Brad to the rock quarry, the witness who testified that Gill admitted before the murder that he and Dunn planned to kill Brad and the eyewitness testimony that Gill helped Dunn throw Brad toward the edge of the sheer drop of the quarry, there still remains Gill's own damning words. Gill admitted to participating in the plot to rob Brad and admitted these discussions included plans to murder Brad. Gill admitted to throwing a big log at Brad while he was hanging onto a sapling at the edge of the sheer drop of the quarry. Gill admitted to throwing a softball-sized rock at Brad's head while he lay helpless and battered on the rock quarry floor. Gill admitted to taking Brad's wallet from his dead body and then taking twenty-one dollars from it. In addition, Gill testified as follows:

Q. And then I think you said on direct that Jim Dunn says to you are you going to help me, right?

Gill: Yes.

Q. So at that point you knew that he was talking about killing Brad?

Gill: Yes.

\* \* \* \* \* \*

Q. You said ... that you realized at the time that Brad is crawling back up and says, "I am going to die aren't I," and Jim Dunn asked you to help him[,] you knew the object at that time was to kill Brad?

Gill: Yes.

Q. And after that is when you started helping Jim Dunn, right?

Gill: That is when I threw the stick, yes.

\* \* \* \* \* \*

Q. Then you say when you all got back in the car after Brad was murdered[,] that Jim Dunn said what about being a natural born killer?

Gill: He said now you know what it feels like.

Q. He said that to you?

Gill: I am guessing, yes.

Q. Because you had participated in killing him, right?

Gill: Yes.

On appeal, Gill makes much of the fact that Dunn in his confession states that it was Gill who threw the rock that struck

the fatal blow. Whereas, Gill testified that it was Dunn who threw the fatal rock. Clearly under the instructions given, the jury's verdict does not turn on who struck the actual fatal blow. When two like-minded souls conspire to set a fire, it does not matter who throws the gasoline and who strikes the match. *See State v. Crepeault*, 126 Vt. 338, 229 A.2d 245, *cert. denied*, 389 U.S. 915, 88 S.Ct. 249, 19 L.Ed.2d 267 (U.S.Vt.1967). In this case, where two like-minded souls are complicit in combining their efforts to kill, it does not matter who struck the fatal blow.

### SEPARATE TRIALS

■ In addition to the above, Gill argues that the trial court erred in granting his motion for a separate trial because he and Dunn had antagonistic defenses and because the jury would likely confuse the evidence against him and Dunn, thereby painting Gill with the same brush as Dunn. A trial court's decision to deny a motion for separate trials is reviewed for abuse of discretion. *Wilson v. Commonwealth*, Ky., 836 S.W.2d 872, 887 (1992), *cert. denied*, 507 U.S. 1034, 113 S.Ct. 1857, 123 L.Ed.2d 479 (1993). Upon review of the record, we conclude that the trial court did not abuse its discretion in denying the motion for separate trials on the following grounds.

■ "A defendant must show that antagonism prevented a jury from being able to separate and treat distinctively evidence that is relevant to each particular defendant at trial and that the antagonism between codefendants will mislead or confuse the jury." *Id.* There is nothing in the record to indicate that the evidence was such that the jury was unable to differentiate between Gill and Dunn. Nor does the record support the conclusion that Gill was somehow tainted by Dunn's bad character.

### INSTRUCTIONS

■ Gill argues that the trial court erred in failing to give an instruction on second-degree manslaughter. Underlying this argument is the assumption that there is evidence in the record to support a finding that Gill acted wantonly. The "absence of intent to cause the death of another is the essence of an unintentional homicide." *Elliott v. Commonwealth*, Ky., 976 S.W.2d 416, 422 (1998). Nothing in the record supports the conclusion that Gill did not intend that Brad die as the result of his and/or Dunn's actions. There was no error.

### CHANGE OF VENUE

Gill next argues that the pretrial publicity in this case was so great that due process of law required a change of venue. He has offered numerous newspaper articles and television broadcasts in support of this argument.

■ Whether to grant a change of venue is within the sound discretion of the trial court. A trial court's decision in this regard will not be disturbed on appeal absent a clear abuse of discretion. *Bowling v. Commonwealth*, Ky., 942 S.W.2d 293, 298, *cert. denied*, 522 U.S. 986, 118 S.Ct. 451, 139 L.Ed.2d 387 (1997). "It is not the amount of publicity which determines that venue should be changed; it is whether public opinion is so aroused as to preclude a fair trial." *Kordenbrock v. Commonwealth*, Ky., 700 S.W.2d 384, 387 (1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2260, 90 L.Ed.2d 704 (1986). The reasoning behind this principle is simple. The jury will be apprised of the relevant facts of the case within minutes after the trial is convened. Thus, "the mere fact that jurors may have heard, talked, or read about a case does not require a change of venue, absent a showing that there is a reasonable likelihood that the accounts or descriptions of the investigation and judicial proceedings have prejudiced the defendant." *Montgomery v. Commonwealth*, Ky., 819 S.W.2d 713, 716 (1991) (internal quotation marks omitted). However, in a truly exceptional case, the degree and the bias of pretrial publicity can be so great so that prejudice may be

presumed. *Jacobs v. Commonwealth,* Ky., 870 S.W.2d 412, 416 (1994). This case does not fit within the exception.

■■■ The record reveals that the trial court was very sensitive to the publicity surrounding this case. In denying an *in limine* motion for a change of venue, the trial court found that there was no showing of "deep and bitter resentment" as was present in *Jacobs* . However, the trial court reserved the issue for further consideration and noted the possibility that the voir dire of the venire might demonstrate such actual prejudice due to the pretrial publicity such that transfer was necessary.

While *Jacobs* holds that undue prejudice may be implied from the pretrial publicity surrounding a trial, the *Jacobs* court relied on the fact that the trial court had a difficult time selecting an impartial jury to support its holding. *Id.* at 416–17. The trial court in the case at bar had little difficulty in selecting a jury. Further, no potential jurors, who initially expressed a view as to Gill's guilt, were subsequently rehabilitated in order to survive a challenge for cause as was the case in *Jacobs.* Thus, as was the case in *Jacobs,* no member of the venire, who initially stated that he believed that Gill was guilty, actually sat in judgment of Gill.

The trial court did not abuse its discretion by denying Gill's motion for a change of venue.

### *VERDICT FORMS*

■■■ Gill argues that the verdict forms directed the jury to sentence him to death or life without possibility of parole for twenty-five (25) years upon finding the existence of an aggravating factor beyond a reasonable doubt. The second-to-last paragraph of the Authorized Sentence Instruction states: "Even though you may find the aggravating circumstance exists, you do not have to fix the defendant's punishment at either the death penalty or imprisonment for life without the benefit of probation or parole until the defendant

has served a minimum of twenty-five years of his sentence." This instruction clearly informed the jury that, despite the finding of an aggravating circumstance, it had the option of fixing Gills' sentence at the other authorized sentences of confinement in the penitentiary for a term of twenty (20) years or more or confinement in the penitentiary for life. *See Perdue v. Commonwealth,* Ky., 916 S.W.2d 148, 168, *cert. denied,* 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996) (upholding similar instructions). There was no error.

For the reasons set forth above, the judgment of the Garrard Circuit Court is hereby affirmed.

LAMBERT, C.J., COOPER, GRAVES, KELLER, and WINTERSHEIMER, JJ., concur.

STUMBO, J., dissents by separate opinion.

STUMBO, Justice, dissenting.

Respectfully, I must dissent from the majority opinion's resolution of two issues. I first object to the holding that the violation of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), is harmless error. The Commonwealth concedes the un-crossed confession of Appellant's co-defendant was improperly admitted at trial. Nevertheless, the Commonwealth simply argues the error was harmless because even had the confession not been introduced, the verdict would have, beyond a reasonable doubt, not differed.

In my view our analysis of this issue should not end with the verdict itself. The admission of the confession had ramifications to Appellant's defense beyond the guilt phase of the trial because the jury easily could have considered the confession in determining the sentence to impose upon Appellant. The jury imposed life without possibility of parole for twenty-five years, the harshest sentence available short of death. The un-crossed confession laid at Appellant's door not just acts leading to the victim's death, but also the planning of the acts and a willing partic-

ipation. Appellant testified that he agreed only to robbing the victim, a claim about which he was closely cross-examined. Yet co-defendant Dunn's similar claim was put before the jury without the jury hearing any questions as to the validity of his assertion. While it is true that other witnesses contested Appellant's testimony on this issue, the fact remains that the man who put Appellant's veracity on the line was not subject to cross-examination and the jurors had no opportunity to judge for themselves his truthfulness. This I believe was reversible error.

Additionally, I find the verdict forms to have been in error. The verdict form submitted to the jury did not provide the jury the opportunity, upon the finding of an aggravating circumstance, to impose any sentence less than life without parole for twenty-five years. We have repeatedly rendered opinions criticizing similar verdict forms. *See, e.g., Chumbler v. Commonwealth,* Ky., 905 S.W.2d 488, 497–98 (1995); *Foley v. Commonwealth,* Ky., 942 S.W.2d 876, 888–89 (1996); and *Haight v. Commonwealth,* Ky., 938 S.W.2d 243, 249 (1996). Here, unlike any of those cases, there is no evidence the jury considered, or even knew it could consider, the lesser penalties of a term of years or straight life. I would therefore reverse the decision of the trial court and remand for a new trial.