RENDERED: June 13, 2019
NOT TO BE PUBLISHED



Supreme Court of Kentucky

2018-SC-000088-MR

JAMES R. HUFFMAN, IV                                    APPELLANT


ON APPEAL FROM LETCHER CIRCUIT COURT
V.        HONORABLE KENT HENDRICKSON, SPECIAL JUDGE
NO. 14-CR-00003


COMMONWEALTH OF KENTUCKY                                    APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**AFFIRM IN PART AND REVERSE AND REMAND IN PART**


James Huffman appeals his conviction following a jury trial in the Letcher Circuit Court. He was convicted of one count of complicity to commit murder, three counts of attempted murder, and one count of criminal mischief. He was sentenced to life imprisonment.

Huffman asserts the following errors on appeal: (1) the trial court erred by denying his motion for change of venue; (2) the trial court should have struck three of the jury pool members for cause; (3) the jury pool did not represent a fair cross-section of the community; (4) the trial court erred by denying his motion to compel the presence of an out-of-state witness; (5) the trial court erred by denying his motion for a directed verdict on two of the attempted murder counts; and (6) the trial court erred by denying the

admission of testimony by an expert witness. Based on the reasons that follow, we affirm in part and reverse and remand in part.

## I. FACTUAL BACKGROUND

The victims in this case are Michael Hogg, Christopher Puckett, Stacy Phillips, and Samantha Mullins. James Huffman and Patrick Smith were together on the night in question when they encountered the victims in Whitesburg. These two groups did not know each other prior to the events in this case. Smith was tried separately and is not subject to this appeal.

Huffman has asserted two sufficiency of the evidence claims, therefore an in-depth recitation of the facts is warranted. This case involves the tragic events of New Year's Eve into New Year's Day of 2014. Hogg, Puckett, Phillips, and Mullins made plans to go out to celebrate the new year. Before going out, Hogg and Phillips went to a liquor store and bought a case of beer and a bottle of liquor. They later met up with Puckett and Mullins, and Ms. Mullins was their designated driver for the evening. The four all gathered at the home of another friend, Morgan Wilson. The case of beer and bottle of liquor were put into the back of Hogg's Jeep Grand Cherokee, the vehicle Ms. Mullins would be chauffeuring them in that night. Then Hogg, Puckett, Phillips, Mullins, and Wilson went to StreetSide, a Whitesburg bar and grill.

A little after midnight, Hogg told Mullins and Wilson to get the Jeep so they could all leave. The Jeep was parked across the street in the parking lot

2

of another bar, Summit City.[1] Mullins was in the driver's seat, and Wilson was in the back seat on the driver's side. Wilson was intoxicated so Mullins wanted her to lie down. Mullins started the car but could not leave right away because other cars were blocking her.

While they were waiting for the other cars to move, two men Mullins did not know came up to her window. These men were later identified as James Huffman and Patrick Smith. They asked if they could get into the vehicle for a minute. Before Mullins could respond, Huffman and Smith went to the passenger side of the Jeep and got in. Smith was in the front seat, and Huffman was in the back on the passenger side. This made Mullins uneasy. But she testified that Smith was friendly and she did not know what else to do other than converse with them. They asked several times if Mullins and Wilson wanted to leave with them, and Mullins repeatedly said no.

During the time Huffman and Smith were in the Jeep with the women, their designated driver, Matthew Blackburn, periodically came up to the Jeep trying to get Huffman and Smith to leave with him. The final time Blackburn came up to the Jeep he threatened to leave Huffman and Smith there without a ride. At this point Huffman and Smith got out of the Jeep, and Mullins picked up her group of friends from StreetSide. Mullins and her friends then returned to Wilson's apartment.

---

[1] Mullins testified that Summit City was the bar she typically went to, so she parked there. But, after she and Wilson went into Summit City and did not see anyone they knew, they joined the rest of the group at StreetSide.

When they got back to Wilson's apartment, Hogg realized his bottle of liquor was missing from the Jeep. The group assumed Huffman must have taken it, as he and Smith were the only other people in the Jeep that night. So, Hogg got Mullins to drive himself, Puckett, and Phillips back to StreetSide so they could try to get the bottle of liquor back from Huffman. Mullins dropped the trio off in front of StreetSide. She then took the Jeep behind StreetSide to its parking lot, where she waited for her friends.

When Hogg, Puckett, and Phillips found Huffman inside and asked him about the bottle, he claimed Blackburn had taken it. But Blackburn was gone and left Huffman and Smith there. Huffman offered to call Blackburn to see if he would bring the bottle back. Several witnesses testified this interaction between the parties was cordial and not threatening in any way.

While Huffman was on the phone trying to contact Blackburn, Huffman, Smith, Hogg, Puckett, and Phillips left the bar and went to the parking lot where Mullins was parked. At some point, Huffman got off the phone, walked over to a rock wall behind the Jeep, and bent down to pick up an object. Huffman then stood up and started walking quickly towards Hogg. Seeing this, Puckett stepped between Huffman and Hogg and was stabbed in the back by Huffman. Upset by this, Hogg tackled Huffman and the two ended up rolling around on the ground fighting. During this scuffle Huffman stabbed Hogg several times. Phillips tried to intervene by either blocking the knife or

4

grabbing the knife,[2] and was cut on his left hand. Phillips was eventually able to get Huffman off Hogg. Then, Phillips, Puckett, and Hogg got into the Jeep and locked the doors. Mullins stayed in the Jeep during the entire altercation.

When they got back into the Jeep, Huffman and Smith had followed them and began beating angrily on the sides of the Jeep and slashed its tires. This was when they realized Smith also had a knife. Mullins quickly pulled out of the parking lot, and Huffman and Smith pursued them on foot. Mullins tried to drive to the hospital but was unable to due to the Jeep's flat tires. Instead, she pulled the Jeep into another parking lot and called 911.

By the time an ambulance got there, Hogg was no longer breathing and was pronounced dead on arrival at the hospital. Puckett's wound was deemed life-threatening, and he was air lifted to another hospital where he later made a full recovery. Phillips' hand was treated, and he was released from the hospital the same day. Mullins was physically unharmed. Huffman received a life sentence for complicity to commit the murder of Hogg; twenty years for the attempted murder of Puckett; ten years for the attempted murder of Phillips; ten years for the attempted murder of Mullins; and five years for criminal mischief. This appeal followed.

---

[2] The testimony was conflicting on this point.

## II.  ANALYSIS

## A. CHANGE OF VENUE

Huffman's first argument on appeal is that the trial court committed reversible error by denying his motion to change the venue of the trial.  He asserts that the media coverage of the case prior to the trial was pervasive and highly prejudicial, which entitled him to a change of venue.

This issue was properly preserved under KRS[3] 452.220,[4] we therefore review the trial court's denial of the motion for abuse of discretion.  *Gill v. Commonwealth*, 7 S.W.3d 365, 369 (Ky. 1999).  The test for abuse of discretion is whether the trial judge's decision "was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Welch v. Commonwealth*, 563 S.W.3d 612, 615 (Ky. 2018).

The standard for granting a change of venue is found is KRS 452.210:

> When a criminal or penal action is pending in any Circuit Court, the judge thereof shall, upon the application of the defendant or of the state, order the trial to be held in some adjacent county to which there is no valid objection, **if it appears that the defendant or the state cannot have a fair trial in the county where the prosecution is pending.**  If the judge is satisfied that a fair trial cannot be had in an adjacent county, he may order the trial to be had in the most convenient county in which a fair trial can be had.

---

[3] Kentucky Revised Statutes.

[4] "If the application is made by the defendant, it shall be made by petition in writing, verified by the defendant, and by the filing of the affidavits of at least two (2) other credible persons, not kin to or of counsel for the defendant, stating that they are acquainted with the state of public opinion in the county objected to, and that they verily believe the statements of the petition for the change of venue are true." KRS 452.220(2).

6

(emphasis added). "In cases alleged to be affected by prejudicial news coverage...the defendant must show 'that (1) there has been prejudicial news coverage, (2) it occurred prior to trial, and (3) the effect of such news coverage is reasonably likely to prevent a fair trial.'" *Sluss v. Commonwealth*, 450 S.W.3d 279, 285-86 (Ky. 2014). However, "a showing of actual prejudice is unnecessary if the procedure involves such a probability that prejudice will result that it is deemed inherently lacking in due process," and "prejudice must be shown unless it may be clearly implied in a case from the totality of the circumstances." *Brewster v. Commonwealth*, 568 S.W.2d 232, 235 (Ky. 1978).

After a thorough review of our case law, holding that the trial court abused its discretion by denying a motion to change venue based on pre-trial publicity appears to be the exception rather than the rule. *See, e.g., Hilton v. Commonwealth*, 539 S.W.3d 1, 7 (Ky. 2018); *Sluss v. Commonwealth*, 450 S.W.3d 279, 286 (Ky. 2014); *Wood v. Commonwealth*, 178 S.W.3d 500, 514 (Ky. 2005); *Fugate v. Commonwealth*, 993 S.W.2d 931, 940 (Ky. 1999); *Bennett v. Commonwealth*, 978 S.W.2d 322, 325 (Ky. 1998); *Montgomery v. Commonwealth*, 819 S.W.2d 713, 716 (Ky. 1991); and *Brewster v. Commonwealth*, 568 S.W.2d 232, 235 (Ky. 1978). And this makes sense given the wide discretion afforded to a trial court in determining a change of venue question. *Wood*, 178 S.W.3d at 513.

One case where reversible error was found is *Jacobs v. Commonwealth*, 870 S.W.2d 412 (Ky. 1994) (overruled on other grounds by *St. Clair v. Commonwealth*, 451 S.W.3d 597 (Ky. 2014)). In *Jacobs*, the defendant was

7

charged with kidnapping, attempting to rape, and murdering an Alice Lloyd College student. *Id.* at 414. Police found the defendant sitting in his truck about seven miles away from the abduction site, and the victim's naked body was found less than sixty feet away from his truck down an embankment. *Id.* at 415. Several of the victim's personal items were also found in the road around his truck, including her jacket with her Alice Lloyd ID badge in the pocket. *Id.* The case was described by county officials as one of the most brutal murders in Knott County history. *Id.*

More pertinent to our analysis, the community sentiment was very negative towards the defendant, as evinced by a public fundraising event that raised $2,922 to aid in his prosecution. *Id.* In addition, a telephone poll was taken and out of 100 callers, 98 knew about the crime, 89 knew the defendant's name, 73 knew he had been in prison before and 60 knew about the previous crime, 85 said he was guilty, and 65 thought he could get a fair trial in Knott County. *Id.* This negative community sentiment was repeated over and over during voir dire. *Id.* Everyone in the jury pool except one person knew about the case. *Id.* Of the 153 potential jurors, 112 were excused for having preconceived notions about the defendant's guilt or admitting to knowing about his previous conviction. *Id.* Finally, of the thirty-eight jurors accepted by the court, nineteen had an initial opinion that the defendant was guilty. *Id.* Of those nineteen, four eventually sat on the panel that tried the case. *Id.*

Based on these circumstances, this Court found clear and convincing prejudice against the defendant amongst the jury. *Id.* at 415-16. We further noted that "[w]e do not require that jurors be totally ignorant of the facts and issues involved. However, the buildup of prejudice is clear and convincing. An examination of the entire voir dire is singularly revealing. The repeated pattern of prejudice is self-evident." *Id.* at 416.

In this case, Huffman presented several news articles in print, some video news coverage, and printouts from two public forum websites[5] as the basis for his argument that he could not get a fair trial in Letcher County. However, "the mere fact that jurors may have heard, talked, or read about a case is not sufficient to sustain a motion for change of venue, absent a showing that there is a reasonable likelihood that the accounts or descriptions of the investigation and judicial proceedings have prejudiced the defendant." *Brewster,* 568 S.W.2d at 235. And, "[a]n examination of jurors on their voir dire is considered to be the best test as to whether local prejudices exist." *Whitler v. Commonwealth,* 810 S.W.2d 505, 507 (Ky. 1991).

Therefore, the trial court conducted individual voir dire for all members of the jury pool who indicated that they had any knowledge of the case via media coverage, social media, or word of mouth. Of the thirty-five (35) people interviewed during individual voir dire, six had formed an opinion about the

---

[5] One forum was "Speak Your Piece," a site sanctioned by *The Mountain Eagle,* a local newspaper. The other was *topix.com.* Both are websites where one can make comments on a given topic anonymously.

defendant's guilt, all of whom were struck for cause. Two expressed apprehension about whether they could find him not guilty based solely on their relationship to one of the victims or their families, but both were struck for cause. Many of the other potential jurors read about the case when the murder happened in January 2014, but they could only remember vague details because the voir dire took place nearly four years later in December 2017. For the most part, those questioned did not know much about the case, the victims, or the defendant. Further, every potential juror who was not struck for cause stated affirmatively that he or she had not expressed or formed an opinion about the guilt or innocence of the defendant, and he or she could render a verdict based solely on the evidence presented.

Therefore, we cannot hold that the same kind of community-wide, prejudicial sentiment that existed in *Jacobs* can be found in this case. The trial court properly and fairly conducted individual voir dire based upon its concern about prejudicial media coverage, and jurors who were found to be prejudiced were struck from the venire. Most of the potential jurors questioned had next to no knowledge of the case, and the number of potential jurors who were prejudiced against Huffman were not substantial enough to warrant a presumption of prejudice based on the totality of the circumstances. Accordingly, we hold the trial court did not abuse its discretion by denying Huffman's change of venue motion.

## B. STRIKING JURY POOL MEMBERS FOR CAUSE

Huffman's next assertion of error is that the trial court erred by failing to strike three members of the jury pool for cause following their individual voir dire.

"To properly preserve error based on a trial court's failure to strike a juror for cause, a defendant must at the very least challenge the juror for cause.... Beyond that, the defendant must also move to excuse that juror and exhaust all of his peremptory challenges." *Sluss*, 450 S.W.3d 279 at 284.

Regarding Bobby Ison and Gary Robbins, Huffman argued they should be struck for cause, but did not use a peremptory strike on either of them. Huffman did not argue David Hardin should have been struck for cause and did not use a peremptory challenge to excuse him. Thus, this issue is not properly preserved for our review. Our only avenue for review would therefore be palpable error review under RCr[6] 10.26. Huffman has not requested palpable error review, and "[a]bsent extreme circumstances amounting to a substantial miscarriage of justice, an appellate court will not engage in palpable error review pursuant to RCr 10.26 unless such a request is made and briefed by the appellant." *Shepherd v. Commonwealth*, 251 S.W.3d 309, 316 (Ky. 2008).

Having reviewed the individual voir dire of all three of these jurors, we cannot say that a substantial miscarriage of justice occurred by the trial court

---

[6] Kentucky Rules of Criminal Procedure.

not striking them for cause. We therefore decline to review this claim of error further.

## C. FAIR CROSS-SECTION

Huffman next argues that his constitutional[7] rights were violated because the jury pool in this case did not represent a fair cross-section of the community.

His argument is novel in that he reasons the venire failed to fulfill the fair cross-section requirement because most of the jury pool lived within the city limits of Whitesburg and Jenkins.[8] He alleges that those living in Whitesburg and Jenkins were "the most exposed to the media coverage in this case," and therefore the selection process "systematically excluded people in the county who would have had less exposure to the media coverage, internet use, or social media opinions." In other words, Huffman alleges that the Letcher countians who lived outside the city limits of Whitesburg and Jenkins were systematically excluded from the venire.

It is well established in our jurisprudence that the Constitution does not require a jury to be an exact reflection of the community. *Commonwealth v. Doss*, 510 S.W.3d 830, 835 (Ky. 2016). Instead, the United States Supreme Court "has unambiguously declared that the American concept of the jury trial contemplates a jury **drawn from** a fair cross-section of the community[.]" *Id.*

---

[7] U.S. Const. amends. VI, XIV.

[8] Whitesburg is the county seat of Letcher County, and Whitesburg and Jenkins have the largest populations in the county.

12

(emphasis added). *Duren v. Missouri*, 439 U.S. 357 (1979), is the seminal case in this area. It lays out the three-part test for a defendant to establish that the fair cross-section requirement has been violated:

> the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* at 364.

For our purposes, we will start with the third prong of *Duren*. To satisfy this prong of the test, Huffman would need to demonstrate that the underrepresentation of potential jurors that live outside the city limits of Whitesburg and Jenkins was the result of a systematic exclusion in the jury process. In this case, the jury was selected at random, which is "the most effective means of rooting out discrimination in the selection of citizens to fill the jury pool so that it reflects a fair cross-section of the community." *Doss* 510 S.W.3d at 836. Huffman has presented no evidence that the selection process was not random or otherwise systematically excluded Letcher County citizens living outside Whitesburg and Jenkins. He therefore cannot satisfy the third prong of *Duren*. Because he must satisfy all three prongs of *Duren* to state a claim for a fair cross-section violation, this claim of error must fail.[9] We

---

[9] We also note that cases finding a group in the community to be a "distinctive group" under *Duren* almost invariably base that finding on the group's race, gender, or opinion about the death penalty. Huffman does not cite, and we have not found, any Kentucky case that stretches the definition of a distinctive group so far as to include

13

therefore hold that the jury pool in this case did not violate Huffman's fair cross-section rights.

## D. COMPULSION OF OUT-OF-STATE WITNESS

Huffman next argues that the trial court erred by denying his motion to compel an out-of-state witness.

The standard for compelling the presence of an out-of-state witness is found under KRS 421.240(2):

> If at a hearing the **judge determines that the witness is material and necessary**, that it will not cause undue hardship to the witness to be compelled to attend and testify in the prosecution...in the other state, and that the laws of the state in which the prosecution is pending...(and of any other state through which the witness may be required to pass by ordinary course of travel), will give to him protection from arrest and the service of civil and criminal process, he shall issue a summons, with a copy of the certificate attached, directing the witness to attend and testify in the court where the prosecution is pending...at a time and place specified in the summons.

(emphasis added). Therefore, a trial court's decision about whether to compel an out-of-state witness is an evidentiary one, and we will review it for abuse of discretion. *Welch v. Commonwealth*, 563 S.W.3d 612, 615 (Ky. 2018).

Huffman claimed his out-of-state witness would have testified he saw Huffman and Smith in the Jeep making out with Mullins and Wilson during

---

where a potential juror resides. *See McFerron v. Commonwealth*, 680 S.W.2d 924 (Ky. 1984) (holding school teachers, physicians, and lawyers are not distinctive groups under *Duren*); *Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky. 2003) (holding college students are not a distinctive group under *Duren*); and *McQueen v. Commonwealth*, 669 S.W.2d 519 (Ky. 1984) (holding young adults are not a distinctive group under *Duren*).

14

the time that Mullins claimed they forced their way into the Jeep uninvited. The trial court initially granted the motion but rescinded it an hour later after finding that the witness would be testifying on a collateral matter and was therefore not material and necessary. Instead, the trial court instructed the Commonwealth to tell its witnesses not to mention any forcible entry into the Jeep. Huffman complains that both Stacy Phillips and Christopher Puckett said that Huffman and Smith "forced" their way into the Jeep. But the record only bears this out regarding Phillips' testimony. Phillips testified: "[Samantha Mullins] had mentioned that some people had got into the Jeep whenever she was going out to retrieve the Jeep to come pick us up. That some people had pretty much forced their way into the jeep uninvited."[10] Following this statement there was an objection and side bench, and the trial court admonished the jury to ignore the word "forced."[11]

Puckett testified: "We got back to Morgan [Wilson's], went inside, and that's when we had learned that someone was in the Jeep bothering the girls."[12] This was also followed by an objection. During the side bench the trial court said he would allow it, but to limit it to that because he did not want any sort of implication that the defendant was behaving like a sexual predator. The

---

[10] Video Record ("VR"): 12/7/17; 2:13:41 pm.

[11] *Id.* at 2:16:33 pm.

[12] VR: 12/8/17; 2:19:36 pm.

15

jury was not admonished, presumably because there was no mention of them forcing their way into the Jeep.[13]

Huffman asserts that the instant that Phillips stated he and Smith forced their way into the Jeep, Huffman's out-of-state witness became material, and the trial court therefore erred in denying the motion to compel. We disagree. The trial court denied the motion because it found that the witness was not material and necessary, as he would be testifying on a collateral matter. It was undisputed that Huffman and Smith were in the Jeep earlier that night. The only relevance of that fact was to show that they had the opportunity to steal the liquor bottle from the vehicle, prompting the victims to return to find them later that night. Whether they were in the Jeep because they forced their way in or were in the Jeep because the girls invited them is irrelevant. We therefore hold that the trial court's finding that the witness was not material and necessary was not arbitrary, unreasonable, unfair, or unsupported by sound legal principles.

### E. DIRECTED VERDICT

Huffman next argues he was entitled to a directed verdict on: (1) the attempted murder of Stacy Phillips; and (2) the attempted murder of Samantha Mullins. "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt,

---

[13] *Id.* at 2:19:58 pm.

only then the defendant is entitled to a directed verdict of acquittal." *Winstead v. Commonwealth*, 327 S.W.3d 386, 398 (Ky. 2010).

> To preserve a trial court's denial of a directed verdict for appellate review, **a defendant must move for a directed verdict at the close of the Commonwealth's case and renew the motion at the conclusion of all the evidence**. And **a defendant "must state specific grounds for relief and should identify which elements of the alleged offense the Commonwealth has failed to prove."** When a defendant fails to preserve an error based upon the sufficiency of the evidence, an appellate court can review the issue for palpable error. But palpable error review will not be granted when a defendant did not move for a directed verdict or affirmatively waived the objection in the trial court."

*Chavies v. Commonwealth*, 354 S.W.3d 103, 113 (Ky. 2011) (emphasis added) *abrogated on other grounds by Roe v. Commonwealth*, 493 S.W.3d 814) (Ky. 2015).

Here, Huffman objected at the end of the Commonwealth's evidence[14] and at the end of all the evidence.[15] However, the objection at the conclusion of all the evidence, after the parties and trial judge spent a significant amount of time discussing the jury instructions, went like this:

**Court**: You have motions?

**Defense**: Yes, sir. At this point in the trial, at the close of all evidence, your honor, I would renew my motion for directed verdict on the basis of the arguments that I previously made. As well as I would move for the court to declare a mistrial based on the arguments for a change of venue, your honor.

---

[14] VR: 12/15/17; 12:05:00 pm.

[15] VR:12/21/17; 4:02:00 pm.

17

**Court**: The motion for directed verdict is overruled. The court finds there is sufficient evidence that it's going to be reasonable for the jury to find guilt on all counts. The motion for mistrial is likewise overruled. Alright, is there anything else we need—

**Defense**: Yes, tendered instructions.

**Court**: Alright, I have a tendered instruction from the defense on Reckless Homicide which I will file. That's your objection to the instructions as they stand, correct?

**Defense**: Other than objecting to them as a whole based on [defense counsel's] motion for directed verdict. We would object to the jury being instructed on any charge based on our motion for a directed verdict your honor.

**Court**: That would follow, it would seem, but that's not a specific objection to any particular instruction.

**Defense**: Not to any particular instruction, just the instructions as a whole.

**Court**: Very good. Thank you all.

This exchange was crucial because "[w]hen there are multiple counts, the proper procedure for challenging the sufficiency of evidence on one particular count **is to object to the giving of an instruction on that count**." *Graves v. Commonwealth*, 17 S.W.3d 858, 866 (Ky. 2000) (emphasis added); *Seay v. Commonwealth*, 609 S.W.2d 128, 130 (Ky. 1980).

Instead of objecting to the instructions for the attempted murder of Phillips and Mullins and stating the specific grounds for the objection, Huffman objected to the jury instructions as a whole. Therefore, these issues

18

were not properly preserved, and we will review them only for palpable error under RCr 10.26. "When an appellate court engages in a palpable error review, its focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006). With these principles in mind, we will address each count individually.

### i.  The Attempted Murder of Stacy Phillips

Huffman asserts that no reasonable juror could have found him guilty of attempting to murder Stacy Phillips. His foundation for this argument is that Phillips himself testified that he did not think Huffman intended to cut his hand.[16] Rather, he cut his hand on the knife either trying to block the knife or get it away from Huffman.

Huffman reasons that attempted murder is an intent crime. *Perry v. Commonwealth*, 839 S.W.2d 268, 273 (Ky. 1992) ("A person is guilty of attempted murder when, with the intent to kill someone, he takes a substantial step toward killing him."). And, therefore, because Phillips admitted that he more or less accidentally cut himself on Huffman's knife, no reasonable juror could have convicted him of attempting to murder Phillips.

However, intent to kill may be inferred from the crime itself and the circumstances surrounding the crime. *Craft v. Commonwealth*, 483 S.W.3d 837, 842 (Ky. 2016). Here, when Phillips was cut, Huffman had already

---

[16] VR: 12/8/17; 10:34:00 am.

19

stabbed Puckett once, severely wounding him, and had stabbed Hogg numerous times, fatally wounding him. Then, after the group was able to get back into the Jeep safely, Huffman and Smith slashed the Jeep's tires, beat on the outside of the Jeep trying to get into it, and pursued the Jeep on foot when the group pulled out of the parking lot.

Therefore, we cannot say it would be clearly unreasonable for a juror to infer Huffman's intent to murder Phillips, and no manifest and fundamental defect resulted in giving a jury instruction on that count.

### ii. The Attempted Murder of Samantha Mullins

However, we do agree that Huffman's conviction for the attempted murder of Samantha Mullins should be reversed. It is undisputed that Mullins never got out of the Jeep during the altercation and was never physically injured by Huffman or Smith. It would therefore be unreasonable for a jury to conclude that Huffman intended to murder her and took a substantial step towards doing so.

We believe that allowing this conviction to stand would be a manifest and fundamental defect that would threaten the integrity of the judicial process. We therefore set aside this conviction.

### F. EXPERT WITNESS TESTIMONY

Huffman's final argument is: "Last, the Defendant argues he was denied due process of law by being denied by the trial court to admit testimony of expert witness Edward Crum, and as such should be granted a new trial, consistent with allowing the expert witness to testify as to his opinions

20

concerning the investigation in this case." This is his entire argument as presented in his brief. There are no cites to the record, no legal authority, and no analysis.

Cr[17] 76.12(4)(c)(v) sets out the requirements for appellate briefs:

> (4) Form and content.
>
> [...]
>
>> (c) Organization and contents-Appellant's brief. The organization and contents of the appellant's brief **shall** be as follows:
>
> [...]
>
>>> (v) An "ARGUMENT" conforming to the statement of Points and Authorities, with ample supportive references to the record and citations of authority pertinent to each issue of law and which shall contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner.

(Emphasis added). Huffman's argument contains no supportive references to the trial record, no citations of authority, and no reference to whether this argument was properly preserved. We therefore decline to address it.

### III.   CONCLUSION

For the foregoing reasons, we affirm Huffman's convictions with the exception of the attempted murder of Samantha Mullins. We, therefore, remand this matter to the Letcher Circuit Court with directions to enter a new judgment consistent herewith.

---

[17] Kentucky Rules of Civil Procedure.

Minton, C.J.; Buckingham, Hughes, Keller, Lambert and VanMeter, JJ.; sitting. Wright, J.; not sitting. Minton, C.J.; Hughes, Keller, Lambert and VanMeter, J.J.; concur. Buckingham, J. concurs in part and dissents in part by separate opinion.

BUCKINGHAM, J.; CONCURRING IN PART AND DISSENTING IN PART: I respectfully concur in part and dissent in part. In addition to reversing the conviction for the attempted murder of Mullins, I would also reverse the conviction for the attempted murder of Phillips. In my opinion the trial court should have granted a directed verdict on that charge. Otherwise, I concur.

COUNSEL FOR APPELLANT:

Athanasia Nicole Lewis

COUNSEL FOR APPELLEE:

Andy Beshear,
Attorney General of Kentucky

Jesse Robbins,
Assistant Attorney General of Kentucky